UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:05-cv-108-RJC

| | |
|---|---|
| RICHARD A. RINALDI, | ) |
| Plaintiff, | ) |
| vs. | ) |
| CCX, INC., BARRY SILVERSTEIN and DENNIS MCGILLICUDDY, | ) **MEMORANDUM AND ORDER** |
| Defendants. | ) |

## I. INTRODUCTION

The plaintiff in this matter, Richard Rinaldi, the former president and chief executive officer of CCX, claims that in 2005 he was fired without cause, but, contrary to his Employment Agreement, the defendants did not pay him his severance. Rinaldi now contends that such conduct by CCX and its owner and its chairman (Silverstein and Dennis McGillicuddy, respectively) constitutes a breach of contract and a violation of the North Carolina Wage and Hour Act, N.C.G.S. §§ 95-25.1, et seq. Jurisdiction is present. 28 U.S.C. § 1332.

Presently before the Court are two motions filed by the defendants. The first motion, filed pursuant to Federal Rule of Civil Procedure 12(b)(6), seeks to dismiss Rinaldi's claim for breach of contract and his claim under the N.C. Wage and Hour Act because the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., preempts those state law claims. The second, filed pursuant to Rule 56(b), contends that after-acquired evidence of Rinaldi's dishonesty and gross-neglect bars his claims. For the following reasons, the Court (i) grants the defendants' motion to dismiss and converts Rinaldi's state law claims into federal ERISA claims; and (ii) denies their motion for summary judgment on the ground that disputes remain as to material facts.

1

## II. UNDISPUTED MATERIAL FACTS[1]

*Rinaldi's Employment Agreement*

Barry Silverstein and Dennis McGillicuddy hired Richard Rinaldi in May 1991 as the company's president and chief executive officer. In March 1994, Rinaldi and CCX executed the First Amendment to his 1991 Employment Agreement (the "Employment Agreement"), which is at issue in this case. Pursuant to that Agreement, Rinaldi's compensation consisted of his Minimum Base Annual Compensation, any amounts earned under CCX's executive bonus plan, and certain fringe benefits consisting of an automobile allowance, term life insurance, travel accident insurance, comprehensive and major medical coverage, a pension plan, a 401(k) Savings and Investment Plan, vacation, sick leave, long-term disability insurance and "[a]ny other benefits normally available to executives of [CCX]." (Employment Agreement, ¶¶ 3, 5, 7).

The Employment Agreement specified that Rinaldi would serve as chief executive officer and president until either he or CCX terminated his employment – Rinaldi through resignation upon not less than 30-day's written notice to the company, and CCX either for an involuntary termination other than for cause, on any date specified in a written notice to Rinaldi; or "for cause," by providing written notice specifying the cause for termination. (Id. at ¶¶ 9-11).

In order to terminate Rinaldi "for cause," CCX was required to determine that Rinaldi had engaged one or more of the following actions:

(a) illegal acts, other than minor traffic violations;
(b) drug or alcohol abuse which substantially affects Executive's performance;
(c) acts of dishonesty (including but not limited to theft or embezzlement) in connection with the Company's business;

---

[1] The following consists of those facts stated in the Complaint, the documents attached to it, including the benefit plan document and other materials on which the plaintiff's allegations explicitly rely, and the defendants' answer. Phillips v. LCI Int'l, Inc., 190 F.3d 609, 611-13, 618 (4th Cir. 1999).

      (d)      conviction for the commission of any felony; and

      (e)      gross neglect of Executive's obligations.

(Id. at ¶ 11).

If CCX terminated Rinaldi for cause, it had no obligation "to provide any compensation, severance pay or benefits" other than those otherwise available "under normal company policy." (Id. at ¶ 11) On the other hand, if CCX terminated Rinaldi involuntarily, CCX had to pay Rinaldi "a lump sum . . . equal to two (2) times [his] then Minimum Annual Base Compensation" [which was $360,000 in 2004] and had to "provide . . . for a period of twenty-four (24) months after [his] termination date" the following additional benefits that Rinaldi had enjoyed as CCX's CEO: automobile allowance, term life insurance, travel, accident insurance, comprehensive and major medical coverage, 401(k) Savings and Investment Plan, long-term disability insurance and "any other benefits normally available to executives of [CCX]." (Id. at ¶¶ 10, 11).

*Rinaldi's Termination*

Rinaldi's employment ended on October 6, 2004, after he had a series of brief phone conversations with the vacationing McGillicuddy and Silverstein, the last of which ended with McGillicuddy telling Rinaldi to "leave the office – go home." Rinaldi received a letter from McGillicuddy dated that same day which accepted the resignation Rinaldi allegedly offered during his telephone conversations with McGillicuddy and Silverstein.[2] His office locks were changed the next day.

Rinaldi has denied resigning in any way, and so he filed this lawsuit in July 2005 seeking the

---

[2] Specifically, the October 6, 2004 letter said "During our discussion today, you were informed of the shareholders' decision to bring in an additional person to participate in the sale process of CCX's Mesh Division. Your response clearly amounts to a resignation and has been deemed as officially received and accepted by the Board of Directors." The letter also mentioned certain behavior by Rinaldi, which "amounted to willful and wanton disregard for the best interests of the company and rises to the level of gross neglect."

unpaid severance wages and benefits that he believes are due under his Employment Agreement.

*Post-Employment Discovery*

Following the filing of the instant suit, Rinaldi testified at deposition that he failed to reimburse CCX for admittedly personal expenses charged on his corporate American Express card, later categorized as business expenses (i.e., plane tickets for his wife and family and U.S. Open tennis tickets for family members). He also conceded that he was responsible for verifying his expense reports and payment authorizations. (See Rinaldi Depo., pp. 669-709). Rinaldi, however, subsequently claimed in an affidavit that (i) he reimbursed CCX for five of these personal charges, and that CCX listed another personal charge in error (Rinaldi Aff., ¶¶ 13-20, 25-26, 30), and (ii) that the nine other personal expenses, totaling $1,981.71, were in fact business, not personal, expenses. (Rinaldi Aff., ¶¶ 21-24, 27-28).

Rinaldi also admitted that on nine occasions he exchanged his accumulated frequent flyer miles for CCX business flights and thereafter submitted expense reports to receive cash reimbursement as if he had paid full fare for such. (See Rinaldi Depo., pp. 262-266) Rinaldi acknowledges that he failed to advise any of his supervisors at CCX that he was doing so, although he disclosed his practice to three of his subordinates. (See Rinaldi Aff., ¶¶ 31-32).

## III. ANALYSIS

A.  The Defendants' Motion for Judgement on the Pleadings[3]

The gist of the defendants' motion is that because Rinaldi's Employment Agreement provides for a detailed and complex severance package, it is an "employee welfare benefit plan" under ERISA (and not merely a contract that provides severance benefits) and therefore his claim for severance wages under breach of contract and violation of the N.C. Wage and Hour Act are preempted. The Court agrees that Rinaldi's claims are preempted by ERISA; however, it will not dismiss Rinaldi's claims, but treat them as federal ERISA claims.

1.  **Because Rinaldi's Employment Agreement provides for a detailed and complex severance package, it is a "employee welfare benefit plan" under ERISA**

ERISA regulates certain aspects of the employer-employee relationship. It also provides an extensive area of federal subject matter jurisdiction. ERISA's preemption provision states that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has interpreted this provision broadly and has held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983).

While ERISA contains a definition of "employee benefit plan," this statutory definition provides

---

[3] As an initial matter, because the defendants have moved for dismissal after filing their Answer, the Court will construe their 12(b)(6) motion as a Rule 12(c) motion for judgment on the pleadings. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). The standard of review for a 12(b)(6) and a 12(c) motion is nearly the same – the Court must accept the nonmovant's allegations as true, viewing the facts in the light most favorable to the nonmoving party – with the real difference being that on a 12(c) motion, the Court considers the Answer as well as the Complaint. Furthermore, the Court notes that consideration of the benefit plan document and other materials on which the plaintiff's allegations explicitly rely does not convert this motion to one for summary judgment under Federal Rule of Civil Procedure 56. See Game World, Inc. v. Olhausen Billiard Mfg., Inc., 49 Fed. Appx. 434, 437 (4th Cir. 2002) (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

5

"scant guidance as to what constitutes a covered 'plan.' " Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995). As a result, case law controls in deciding whether a plan exists.

In Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987), the Supreme Court established the test for analyzing whether an employee benefit plan exists: "an employee benefit plan exists if the benefits provided by their very nature require "an ongoing administrative program to meet the employer's obligation." 482 U.S. at 11. The Court thus found that a Maine statute, requiring employers "to provide a one-time severance payment to employees in the event of a plant closing," did not create an employee benefit plan. Id. at 3. As the Supreme Court noted, "To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility." Id. at 12.

The Fourth Circuit has not established a set of factors for determining whether the payment of severance benefits requires an ongoing administrative scheme. As a result, the district courts in this circuit consider a variety of factors, including specifically "(1) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed; (2) whether payments are triggered by a single, unique event in the course of business or on a recurring basis; (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments; and (4) whether the employer undertook any long-term obligations with respect to the payments." Mullaly v. Ins. Servs. Office, Inc., 395 F. Supp. 2d 290, 295 (M.D.N.C. 2005); Emery v. Bay Capital Corp., 354 F. Supp. 2d 589, 593 (D.Md. 2005); Donovan v. Branch Banking & Trust Co., 220 F. Supp. 2d 560, 564-65 (S.D.W.Va. 2002); Blair v. Young Phillips Corp., 158 F. Supp. 2d 654, 659 n. 3 (M.D.N.C. 2001).

Having reviewed Rinaldi's entire Employment Agreement the Court concludes that, unlike the Maine statute in Fort Halifax, the Employment Agreement constituted a plan to administer the benefits

provided. CCX's obligation to pay severance benefits is triggered by the occurrence of multiple events rather than by a single contingency that may never materialize. It also provides a two year period of ongoing benefits and perquisites mandated by the terms of the Employment Agreement. This term requires an ongoing administrative program from CCX to determine eligibility and make decisions on what benefits will be paid and how they are to be paid throughout the severance process. All these terms and conditions easily satisfy any requirement of an ongoing administrative program.

> *a. By its terms, the Employment Agreement "requires an individualized determination of eligibility and the exercise of managerial discretion."*

CCX must, as an initial matter, determine whether Rinaldi is eligible for severance. Unlike the cases in which the court found that a single unique event triggered payment of benefits,[4] CCX must decide whether Rinaldi's termination was for cause or involuntary, and in some circumstances whether any one of several other specified events gave rise to severance benefits had occurred. Rinaldi then receives severance only if CCX decides that no cause exists. (See Employment Agreement, ¶ 11).

The for-cause determination alone requires CCX to determine whether any one of five causal events has transpired. This exercise of discretion is far from being the "purely mechanical determination of eligibility" that Rinaldi claims it is as CCX must determine if Rinaldi has committed illegal acts other than minor traffic violations, engaged in drug or alcohol abuse substantially affecting his performance, engaged in acts of dishonesty, committed a felony or committed gross neglect. (Employment Agreement, ¶ 11); see, e.g., Petersen v. E.F. Johnson Co., 366 F.3d 676, 679-80 (8th Cir. 2004) (holding that severance package available only to those terminated "without cause" required ongoing administrative scheme and thus qualified as an ERISA plan); Cole v. Champion Enter., Inc., No. 05-4 15, slip. op. at 14-15

---

[4] See, e.g., Belanger, 71 F.3d at 455 (early retirement offer); Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 258 (8th Cir. 1994) (golden parachute); Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1538-39 (3d Cir. 1992) (buyout plan); Fontenot v. NL Indus. Inc., 953 F.2d 960, 962 (5th Cir. 1992) (golden parachute).

7

(M.D.N.C. Nov. 1, 2005) ("The inherent discretion in a 'cause' determination is a strong indicator of an ongoing administrative plan" (citations omitted)); Mullaly, 395 F. Supp. 2d at 295 (finding ERISA plan where defendant "must consider the type and seriousness of any infraction before it can determine whether severance benefits should be refused"); Blair, 158 F. Supp. 2d at 659-60 (noting that when a "for cause" determination must be made in a severance plan, it is a significant factor implicating ERISA); but see Belanger, 71 F.3d at 455 (holding that a "for cause" determination was a "purely mechanical determination of eligibility").

Throughout the course of Rinaldi's employment, CCX must also analyze whether severance entitlement has arisen due to any of several other triggering events. These include termination of Rinaldi "[o]ther than for cause," or termination triggered by (i) "a substantial reduction in the scope of the Executive's duties," (ii) "a substantial breach of [CCX's] reduction in the scope of the Executive's duties," (ii) "a substantial breach of [CCX's] obligations" regarding compensation and benefits or (iii) "a sale of [CCX] or substantially all its assets." (Employment Agreement, ¶ 10(a), (b)). In addition, Rinaldi may elect involuntary termination and payment of severance in the event CCX files for bankruptcy, makes assignment for creditors, is directed by a receiver or if certain named shareholders no longer beneficially own common stock. (See id. at ¶ 10(c)).

Thus, unlike the Maine statute in Fort Halifax and the programs in the other cases cited by Rinaldi, severance here is not triggered by a single event requiring little or no discretionary analysis by the employer. Rather, the Employment Agreement mandates a significant level of discretion throughout Rinaldi's course of employment to decide in the first instance whether severance is triggered by any number of different circumstances.

*b. The benefits are provided on a regularly occurring basis rather than on a single occasion.*

According to Rinaldi, the Employment Agreement at issue is comparable to the Maine statute in Fort Halifax, since "[a]ll CCX must do is basic math . . . and write a check" for two times his salary. A lump-sum "salary times two" calculation, however, is not the only mandate for employer-provided benefits under the Employment Agreement, which expressly requires that CCX must provide during the two-year period after his termination such additional benefits as: an automobile allowance, term life insurance, travel accident insurance, comprehensive and medical coverage, a 401(k) savings and investment plan, long-term disability insurance and "any other benefits normally available to executives of [CCX]." (Employment Agreement, ¶ 10). CCX thus undertook an ongoing responsibility different from that considered in Fort Halifax and similar to those the Supreme Court described as requiring an ongoing administrative program. In sum, to carry out the obligations assumed under Rinaldi's contract, CCX had to do more than merely write a check twice. See, e.g., Cvelbar v. CBI Illinois Inc., 106 F.3d 1368, 1376-77 (7th Cir. 1997) (holding agreement to pay severance benefits to employee for three years upon termination required administrative scheme); Williams v. Wright, 927 F.2d 1540, 1544-45 (11th Cir. 1991) (holding agreement to issue check each month until death of employee implicated ERISA).

*c. By its express terms, the Employment Agreement set conditions that require both continued discretion and long-term obligations on the part of CCX*

Rinaldi argues that "[t]he continuation of his health coverage, insurance coverages, and other benefits are merely incidental to the lump-sum payment" and requires only that "CCX maintain the status quo (e.g., continue making payments for insurance premiums), rather than create an administrative scheme to accomplish the ends of the severance agreement." (Plaintiff's Response at 14). For support, Rinaldi focuses on cases in which the severance benefits were predetermined and continued under

9

preexisting insurance policies and other contracts without the need for employer discretion "about the timing, amount or form of these benefits."[5]

Unlike in the cases cited by Rinaldi, however, the Employment Agreement mandates an abundance of severance benefits payable outside of the bounds of pre-existing contracts and benefit plans, some of which cannot be continued and paid to a non-employee under the same policy terms. Thus, by its express terms, the Employment Agreement requires CCX to exercise considerable discretion and monitoring as to what benefits will be paid and monitor how they are to be paid throughout the severance process.

One example is the automobile allowance. CCX must not only decide the "suitable" amount to pay, but to pay the benefit over time, it must also gather, verify and monitor payment of "all reasonable operating expenses incurred in connection with such automobile" for a two-year period to an ex-employee. (Employment Agreement, ¶ 5). CCX must also adopt an ongoing administrative program to pay applicable federal, state and local taxes related to the automobile allowance. (See Employment Agreement, ¶¶ 5, 10(f) (all benefits payments subject to tax withholdings)). No benefit provider or insurance carrier has been contracted to do this. This burden falls squarely on CCX.

Likewise, CCX must play an ongoing discretionary role by determining what benefits fall within

---

[5] See Plaintiff's Response, pp. 12-20, citing, inter alia, Delaye v. Agripac, Inc., 39 F.3d 235, 237 (9th Cir. 1994) (analyzing scheme with "nothing discretionary about the timing, amount or form of payment"); Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994) ("An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan."); Sherrod v. Gen. Motors Corp., 33 F.3d 636, 639 (6th Cir. 1994) (severance plan in which benefits were predetermined and involved simple mechanical determination was found not to be an ERISA plan); Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1538-39 (3d Cir. 1992) (finding that the benefits were provided according to an existing plan and were simply continued, rather than paid to any new or separately created administrative structure); Fontenot v. NL Indus., Inc., 953 F.2d 960, 961 (5th Cir. 1992) (lump-sum cash payment of three times his highest annual compensation for the proceeding three years, as well as a three-year continuation of certain benefits did not invoke ERISA); Donovan v. Branch Banking & Trust Co., 220 F. Supp. 2d 560, 565-66 (S.D.W.Va. 2002) (no ongoing administrative scheme was needed because the "'same level' of medical, dental, accidental, disability, and life insurance benefits" was to be paid "upon the same terms and conditions as existed immediately prior to Donovan's . . . termination").

the "catchall provision" and by making arrangements in the event of a qualifying termination to provide these benefits over a two-year period to an ex-employee. Moreover, many of the benefits due under the "catchall provision" such as country club dues and payment for reasonable office, computer, phone and internet expenses also involve no pre-existing contract or insurance policy.

Finally, CCX will also have to exercise discretion and establish an ongoing administrative program because certain severance benefits listed in the Employment Agreement cannot be paid to non-employees under the terms of applicable insurance and benefit policies. This is true for the 401(k) savings and investment plan (see Employment Agreement, ¶ 7(e)), as well as for the term life, travel accident and long term disability insurance policies (see id., ¶¶ 7(a), (b), (h)). Should CCX choose to pay anything upon severance for such benefits, it would have to decide how much to pay Rinaldi, and how to make such payments, whether by providing equivalent benefits such as a conversion policy or monetary compensation.

> **2. ERISA preempts Rinaldi's state law claims for breach of severance agreement and violation of the N.C. Wage and Hour Act; the Court will treat them as federal ERISA claims.**[6]

Section 514(a) of ERISA provides that ERISA "preempts any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. §1144(a). A law "relates to" an employee benefit plan and is preempted under § 1144(a) if, "in the normal sense of the phrase, [] it has a connection with or reference to such a plan." Shaw, 463 U.S. at 96-97.[7]

---

[6] In his first claim for breach of contract, Rinaldi alleges that CCX breached the Employment Agreement "by withholding and denying the compensation due [him] pursuant to an involuntary termination under the Employment Agreement . . . and denying payment . . . of all associated . . . benefits due . . . . ." (Compl. ¶¶ 45-46). In his second claim, he alleges that CCX violated the North Carolina Wage and Hour Act by failing to pay him severance "pursuant to the Employment Agreement." (Compl. ¶¶ 53-55, 57).

[7] Exceptions to preemption exist, see 29 U.S.C. § 1144(b), but Rinaldi does not argue that any of these exceptions apply.

The law of the Fourth Circuit leaves little doubt that ERISA governs employer breaches of severance plans and completely preempts state law breach of contract claims on such plans. See Biggers v. Wittek Indus., Inc., 4 F.3d 291, 297 (4th Cir. 1993) ("It is beyond question that plans established by an employer to provide severance benefits are employee welfare benefit plans within the scope of ERISA."). ERISA also completely preempts state laws "invoked in pursuit of benefits allegedly due under [a] severance pay plan," including state law claims asserted under the N.C. Wage and Hour Act regarding payment of severance benefits are preempted by ERISA. Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1147 (4th Cir. 1985)); see also Stiltner v. Beretta U.S.A .Corp., 74 F.3d 1473, 1481 (4th Cir. 1996) (holding that ERISA preempted employee's state law claim that former employer's refusal to pay disability benefits constituted intentional infliction of emotional distress).

Here, it is clear that Rinaldi's state law claims explicitly relate to the Employment Agreement, which is an employee benefit plan under ERISA and which by its terms sets forth the "full and complete compensation" to which Rinaldi is allegedly due (Employment Agreement, ¶ 13(c)), Rinaldi's state law claims are therefore preempted by ERISA.

Having determined that ERISA preempts Plaintiff's state law claims, the Court must now decide whether dismissal is appropriate. The Fourth Circuit has held that if a state law claim seeks remedies that fall within the civil enforcement provision of ERISA, ERISA § 502(a), 29 U.S.C. § 1132(a), federal courts should not dismiss the claim, but treat it as a federal ERISA claim. Singh v. Prudential Health Care Plan, Inc., 335 F.3d 278, 290 (4th Cir. 2003); Darcangelo v. Verizon Comm'cns., Inc., 292 F.3d 181, 195 (4th Cir. 2002) ("What was a state claim for breach of contract becomes a federal claim for the enforcement of contractual rights under [ERISA] § 502(a)(1)(B)."). If the state law claim seeks remedies outside the scope of ERISA's civil enforcement provision, however, the state law claim should be dismissed. Singh,

335 F.3d at 290.

Here, ERISA's civil enforcement provision provides, in part, that a civil action may be brought by a plan participant or beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Rinaldi's breach of contract claim seeks benefits allegedly owed him under the plan. Thus, his requested remedy is the same remedy provided by ERISA's civil enforcement provision. As a result, the Court will treat the breach of contract claim as a claim brought under ERISA § 502(a)(1)(B) with the remedies limited to those in § 502. Id. In his Wage Act claim, Rinaldi asserts that CCX wrongfully withheld severance wages, and are liable for liquidated damages and attorney's fees under §95-25.22. The Court likewise will convert the cause of action, though Rinaldi is limited to § 502's remedies.

### B. Motion for Summary Judgment

The defendants have moved for summary judgement on the grounds that, given his admissions during discovery (see *supra*, p. 3), Rinaldi cannot demonstrate that a genuine, triable issue exists on any fact material to their after-acquired evidence defense. The Court disagrees and will deny the defendants' motion.

The after-acquired evidence defense can bar recovery for a breach of employment contract claim where the employer establishes not only that it had cause to terminate the employee, but would have done so if it had known of prior misconduct. Tooker v. Medex, Inc., No. 04-2, slip. op. at 11 (E.D.N.C. July 13, 2005); Schiavello v. Delmarva Sys. Corp., 61 F. Supp. 2d 110 (D.Del. 1999).

In this case, the defendants points to Rinaldi's admitted failure to reimburse personal charges on his corporate American Express and his admitted but undisclosed practice of converting business frequent

flyer miles into personal cash. CCX also submits an affidavit from Dennis McGillicuddy, Chairman of the Board of CCX, to the effect that the company would have fired Rinaldi for either gross neglect or dishonesty had it known of his conduct: "Each of Mr. Rinaldi's practices breached the terms of the Employment Agreement [. . . .] Had CCX known that Mr. Rinaldi pursued the above practices prior to October 6, 2004, it would have terminated him immediately for cause." (McGillicuddy Aff., ¶¶ 14-15). No other evidence (i.e., a written policy or handbook defining dishonesty or gross neglect, examples of other employees who were fired in similar circumstances, evidence of warnings to Rinaldi that such conducted would result in his termination), however, is provided by CCX. This statement is self-serving and uncorroborated. It certainly is not self-evident nor sunbect to the Court giving it conclusive effect.

Even assuming that (a) the evidence of misconduct is in fact uncontroverted[8] and (b) the affidavit establishes that such behavior would have breached the Employment Agreement and been grounds for termination, the Court finds that, by itself, the affidavit by McGillicudy stating what he now believes CCX would have done in a hypothetical situation is insufficient to establish the material fact that CCX would in fact have fired Rinaldi. The Court, of course, does not hold that an affidavit on the "would-have discharged question," stating what the company would have done in a hypothetical situation, will never be conclusive for summary judgment purposes, only that the affidavit in this case is insufficient. Cf. Davis v. Zahradnick, 600 F.2d 460 (4th Cir. 1979) (summary judgment is inappropriate when conflicting affidavits require credibility determinations).

---

[8] The Court need not rule on whether, pursuant to Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07 (1999), Rinaldi's affidavit contains a satisfactory explanation of the alleged contradictions between the affidavit and his earlier deposition testimony, or whether any newly discovered evidence furnishes a good faith basis for any inconsistency between the two.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the Employment Agreement is an employee benefit plan as defined by ERISA, 29 U.S.C. §§ 1001 et seq., and that ERISA preempts Rinaldi's state law claims. Accordingly, the Court will treat them as federal claims under 29 U.S.C. § 1132. The Court also finds that as a dispute of fact material to Rinaldi's claim remains, summary judgment is inappropriate.

**THEREFORE, IT IS HEREBY ORDERED THAT** the Defendants' Motion to Dismiss (Doc. No. 36) **BE GRANTED IN PART**; Plaintiff's state law claims are hereby converted to federal ERISA claims as discussed above. **FURTHERMORE, IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 38) **BE DENIED**.

Signed: July 2, 2008

Robert J. Conrad, Jr.
Chief United States District Judge

.