# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:05-cv-108-RJC

| | |
|---|---|
| RICHARD RINALDI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CCX, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**THIS MATTER** is before the Court following a bench trial[1] on the merits of plaintiff's claim for benefits as a result of a termination not for cause. The Court has previously converted this case to a claim for benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 502(a)(1)(B). (Doc. No. 57). The Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). For the reasons set forth below, the Court finds for plaintiff and awards damages in the amount of $880,000.00 plus pre-judgment interest.

## FINDINGS OF FACT

### A. Events leading up to the October 6 phone call

1. At all times relevant to this action, CCX, Inc. was Richard Rinaldi's employer within the

---

[1] With respect to Plaintiff's claim for benefits allegedly due, Plaintiff is not entitled to a jury trial. See Cherepinsky v. Sears Roebuck & Co., 455 F. Supp. 2d 470, 476 (D.S.C. 2006) ("Ultimately, without further guidance from the Fourth Circuit on this point, [i]n view of the well-reasoned opinions within the district courts of the Fourth Circuit that have followed after Hulcher [v. United Behavioral Sys., Inc., 919 F. Supp. 879, 884 (E.D.Va. 1995)], this court is of the opinion that it is still good law in the Fourth Circuit that ERISA actions are equitable in nature and are for the Court to decide rather than the jury." (internal quotation marks omitted)); Ellis v. Metropolitan Life Ins. Co., 919 F. Supp. 936, 938 (E.D.Va. 1996) ("Biggers involved essentially the same issue presented here: a denial of benefits to an individual employee under the employee benefit plan. The district court in Biggers had examined the question under state law contract principles, without considering that trusts were traditionally a matter for the chancery, not the law courts. But because the action itself stated a claim under ERISA, the Fourth Circuit states, in no uncertain terms, that it required a bench trial.").

meaning of the Employee Retirement Income Security Act, codified at 29 U.S.C. § 1001, *et seq*.

2. On or about May 9, 1991, Richard Rinaldi began employment with CCX as President and Chief Executive Officer ("CEO").

3. On or about March 25, 1994, Richard Rinaldi entered into the First Amendment to Employment Agreement (the "Employment Agreement"), the terms of which were in effect for the remainder of Richard Rinaldi's employment with CCX.

4. As of October 6, 2004, Richard Rinaldi's Minimum Annual Base Compensation under the Employment Agreement was $360,000.

5. The Employment Agreement provided that Rinaldi could voluntarily terminate his employment by giving 30 days written notice. (Pl. Trial Ex. 2 ¶ 9). It further provided for certain severance benefits if the company terminated Rinaldi's employment other than for cause. (Id. ¶ 10). Paragraph 12 also provided for severance benefits in the event that CCX sold substantially all of its assets. (Id. ¶ 12). Paragraph 11, however, provided for no severance benefits if Rinaldi was terminated for cause in the following events: illegal acts; drug or alcohol abuse; acts of dishonesty; conviction for the commission of any felony; or gross neglect. (Id. ¶ 11).

6. As of October 6, 2004, the CCX Board of Directors consisted of Dennis McGillicuddy, Lois May, Simon Jaspers, Randy Arnaud, and Richard Rinaldi. Silverstein and McGillicuddy were the beneficial owners of approximately 80% of CCX's stock. McGillicuddy was the chairman of CCX's Board of Directors.

7. Rinaldi's efforts as CEO were well-received, and he was handsomely rewarded by salary and

bonuses over the years. As a result, due in part to his leadership, the shareholders, especially McGillicuddy and Silverstein received handsome returns on their investments. Rinaldi was respected throughout the company according to Nancy Sedan, the former assistant financial comptroller, and the majority shareholders Silverstein and McGillicuddy.

8. In or about January 2004, CCX began efforts to find buyers for its Mesh Division, which constituted approximately 90% of the company and employed most of its employees. The goal was complete liquidation of shareholder's investment.

9. On May 7, 2004, Rinaldi sent a letter (Pl. Trial Ex. 11) to McGillicuddy suggesting that a sale of the mesh division would trigger his severance, a fact which McGillicuddy testified he was aware of as a result of reviewing a sales projection sheet (Pl. Trial Ex. 12). Rinaldi indicated that he was busy and that the sale might better be handled out of Florida but acknowledged that it was McGillicuddy's decision.

10. Shortly afterwards, McGillicuddy and Silverstein left the country on travel aboard an over seas condominium ship. They left behind a negotiating team that consisted of Rinaldi, Greg LeNeave, Rinaldi's choice for investment banker, along with Jeff McCurdy and Durral Gilbert, two employees of a company whose purpose was to protect investments of the families of McGillicuddy and Silverstein.

11. By September 2004, the pool of potential buyers of the mesh division had reduced to approximately five. Some were financial buyers and others were strategic, meaning that they were competitors.

12. In a letter to Leneave, copied to McCurdy and Gilbert and dated September 22, 2004, Rinaldi emphasized his concerns, principal of which was giving early access in the preliminary

screening process to strategic suitors. (Pl. Trial Ex. 14).

13. In the months leading up to October 6, 2004, a split began to develop in the approach of Rinaldi as CEO and McCurdy/Gilbert whose primary interest was looking out for CCX's shareholder interest. Rinaldi wanted to keep most of the information about the company from the potential investors whereas McCurdy/Gilbert thought the best strategy for maximizing shareholder value required that they give more information to investors.

14. On September 30 and October 1, 2004, Rinaldi, LeNeave, Gilbert, and McCurdy met with three potential buyers of the Mesh Division.

15. On October 2, 2004, Rinaldi emailed McGillicuddy to review the meetings and to express confidence in accomplishing the objectives but noting that McCurdy and Gilbert might disagree on several critical strategic points. (Pl. Trial Ex. 15). Rinaldi inquired as to the need for a "new huddle." (Id.). McGillicuddy did not respond to the email.

16. On October 4, 2004, Rinaldi called McGillicuddy concerning the October 2 email. McGillicuddy told him that they did not need a "huddle" and that Rinaldi needed to keep an open mind as to McCurdy.

17. While initially satisfied with Rinaldi's approach, McCurdy began to develop concerns about Rinaldi's perceived autocratic and confrontational style, management of information flow and disinterest in maximizing shareholder value. After the meeting with the these prospective buyers, it was clear to McCurdy that Rinaldi had no concern for shareholder value. Rinaldi insulted the chairman of New York Wire, causing its representative to remark on Rinaldi's indifference to shareholder value. McCurdy testified that Rinaldi said, "I'm ok with that." Finally, McCurdy testified that LeNeave thought the sale would be extremely

difficult if Rinaldi continued with his combative approach.

18. There is no evidence that McCurdy conveyed these concerns to Rinaldi, but in a phone call and in an email dated October 5, 2004 (Def. Trial Ex. 25), McCurdy communicated these issues to McGillicuddy and Silverstein. In the October 5, 2004 email, McCurdy attached a memo explaining the problems with Rinaldi and listing four options: 1) do nothing and let Rinaldi continue in his way; 2) keep Rinaldi but engage Jim Shein to direct the sales process; 3) terminate Rinaldi and continue with sales process; and 4) terminate Rinaldi and bring in an interim turn-around manager. (Id.).

19. As a result of McCurdy's telephone call and email, Silverstein testified that he began to see Rinaldi as a bottleneck.

20. On October 5 or 6, 2004, Rinaldi spoke with McCurdy, who did not inform Rinaldi that he had telephoned McGillicuddy or sent an email critical of Rinaldi's conduct in meetings with prospective buyers.

21. Prior to the October 6, 2004 telephone call with Silverstein, there is no credible evidence that Silverstein or McGillicuddy indicated to anyone which of McCurdy's suggested options they preferred. There is no evidence that anyone told Rinaldi of dissatisfaction with his approach.

**B. October 6, 2004 phone call**

22. On October 6, 2004, Silverstein and McGillicuddy attempted to contact Rinaldi by telephone from their ship office off the coast of Istanbul, Turkey. Unable to reach him at the office, they then called him at home but were unsuccessful due to some form of blocking. Silverstein then called Rinaldi's administrative assistant and asked her to call Rinaldi and tell him to call Silverstein, indicating that it was urgent.

23. The versions of what transpired during this October 6 phone call are in conflict among the witnesses, and are internally inconsistent to varying degrees based upon conflicting witness notes, depositions, and trial testimony. Each witness suffers from self-interest, bias, and inconsistency.

24. Rinaldi testified that the call was with Silverstein but that McGillicuddy might have been in the background. Both Silverstein and McGillicuddy testified that McGillicuddy was part of the call, but neither said he had any significant role. His active involvement in the call is not reflected in his notes. (Def. Trial Ex. 4 & 5).

25. A series of calls were placed from Rinaldi's home phone to Silverstein's phone. Rinaldi's phone had two lines: 704.541.9932 and 704.542.3245. The phone had a rollover feature if the default line was in use. The following chart shows the information from Rinaldi's phone carrier, Bell South, regarding the calls made from Rinaldi's phone lines on October 6, 2004.

| Call Date | Call Time | Calling Number | Called Number | Call Duration |
| --- | --- | --- | --- | --- |
| 10/6/04 | 11:47:00 a.m.<br>11:47:09 a.m. | 704-541-9932 | 954-499-5310 | 0 seconds |
| 10/6/04 | 11:47:35 a.m.<br>11:47:43 a.m. | 704-541-9932 | 954-499-5310 | 34.9 seconds<br>35.6 seconds |
| 10/6/04 | 11:48:08 a.m.<br>11:48:16 a.m. | 704-541-9932 | 954-499-5310 | 2.1 seconds<br>2.8 seconds |
| 10/6/04 | 11:48:21 a.m.<br>11:48:29 a.m. | 704-541-9932 | 954-499-5310 | 0 seconds<br>0 seconds |
| 10/6/04 | 11:48:59 a.m.<br>11:49:07 a.m. | 704-541-9932 | 954-499-5310 | 7 seconds<br>7.7 seconds |
| 10/6/04 | 11:49 a.m. | 704-542-3245 | 954-499-5310 | 1 minute |
| 10/6/04 | 11:52:34 a.m.<br>11:52:42 a.m. | 704-541-9932 | 954-499-5310 | 9.6 seconds<br>10.4 seconds |

| 10/6/04 | 11:53 a.m. | 704-542-3245 | 954-499-5310 | 5 minutes |

(See Def. Trial Ex. 6 & 37).

26. Rinaldi's testimony is that the call lasted approximately 36 seconds and that he made a series of unsuccessful attempts to call back afterward. He explains that the 11:53 a.m. call item likely reflects his attempt to call back in which he let the phone ring for a long period of time and talked with Mrs. Silverstein. (Def. Trial Ex. 37). CCX's position is that there was a call lasting approximately 5 minutes and no follow-up attempt. The Court concludes that the phone records are consistent with Rinaldi's testimony.

27. Rinaldi testified that Cheryl Coker, his administrative assistant, called him at home and said to call Silverstein back because it was urgent. By the time Rinaldi returned the call at 11:53 a.m., Silverstein was agitated. Silverstein and McGillicuddy's testimony to the contrary is not credible based upon the nature of the call, the inability to get through to their employee, the use of foul language (about which the Court credits Rinaldi's testimony), and the Court's own observation of the witnesses' demeanor.

28. When Rinaldi reached Silverstein, Silverstein complained about the block on Rinaldi's home line and Rinaldi responded that he did not know of any block and would look into it. Silverstein started to talk about Jim Shein. Rinaldi interrupted him and said, "I know Jim Shein, what's your point?" Silverstein responded: "Listen you fucking asshole, I have more skin in this game than anyone else and I'm not having a rank amateur sell the division." Rinaldi responded that "if there are any rank amateurs, they are your two guys in Florida. I got more to do than work with them. If you don't have confidence in me, fine, I'm not involved." Then, Silverstein hung up.

7

29. All witnesses agree that Rinaldi never used the words "I quit" or "I resign.

30. Silverstein's testimony corroborated comments about "skin" and "amateur" but differed in these ways. He testified that he wasn't complaining about the block but was "intrigued" and "complimented" Rinaldi for having it. Importantly, he stated that Rinaldi said: "If they were trying to force Jim Shein on him he was out of there." Rinaldi was going his separate way. Silverstein was "shocked," looked at McGillicuddy and paused for a few moments. He then said, "Consider it done" and hung up. After fourteen years of working with Rinaldi, the one phone call "shattered their trust," and Silverstein "did not want any part of him."

31. McGillicuddy largely confirmed Silverstein's testimony. Rinaldi said, "I'm not interested if what you're getting at is bringing Shein in I'm not interested in that" and "if you do that or bring in Jim Shein I'm out of here." McGillicuddy also expressed being "shocked." He described Rinaldi's tone as "imperial."

32. After the phone call the shareholders moved quickly. They informed McCurdy that Rinaldi resigned and McCurdy drafted an "acceptance" letter with the aid of a law firm for McGillicuddy's signature. (See Def. Trial Ex. 15). McGillicuddy admitted that the letter was drafted with legal consequences in mind. McCurdy then had the locks changed at corporate headquarters.

33. McGillicuddy also says that he received a second call from Rinaldi later that night. His wife's notes reflect that Rinaldi told her he didn't resign, and McGillicuddy's notes reflect the reasons Rinaldi gave for not resigning. (Def. Trial Ex. 42). Rinaldi asked him if he was terminating him and McGillicuddy responded that it was Rinaldi who resigned. McGillicuddy told Rinaldi "to go home" and that he was not authorized to run the business.

34. The Court finds several aspects of Silverstein and McGillicuddy's testimony not credible. First, they could not have been shocked at Rinaldi's reaction. Both are successful businessmen who have negotiated many deals. They would be familiar with conflict, tense exchanges, and reactions to provocative statements such as calling the CEO a "rank amateur" and "fucking asshole." Second, it would have been apparent to both that Rinaldi was being blind-sided by this call, not having been told previously that there was a problem. Third, Silverstein's testimony that this brief exchange with a 14 year officer of the company caused a complete collapse of trust is not credible. Fourth, their testimony that they considered Rinaldi "crucial" and "critical to the sales process" is belied by their subsequent actions. They made no attempt to clarify the exchange with Rinaldi. They did not ask for a written resignation consistent with paragraph 9 of the Employment Agreement. They ignored Rinaldi's calls, one of which he explained that he did not resign. They quickly engineered a letter "accepting" his resignation, referring to Rinaldi not as "critical" or "crucial" but rather as "intemperate" and his conduct as rising to the level of "gross neglect." (Def. Trial Ex. 15). They eventually locked him out of headquarters. The Court finds that these are actions of men who seized upon an opportunity to remove someone who had become in their mind an impediment to both higher shareholder value in a sale of the Mesh Division and potentially higher return on their attempt to liquidate their investment.

35. The Court also finds that Rinaldi's conduct is consistent with someone who did not resign. He made repeated attempts to re-connect with Silverstein and McGillicuddy. He was worried that the major shareholder had cursed him, and called him a "rank amateur." He was concerned for his future.

36. At 3 p.m. that afternoon, Rinaldi conducted a regularly scheduled call with the Chief Financial Officer ("CFO"), Frank Feeney. When Rinaldi learned through Feeney that Silverstein and McGillicuddy had told others he had resigned, he quickly set about correcting that impression through phone calls and a series of emails. (Pl. Trial Ex. 21, 22, 23, 24).

37. After going to dinner with his wife, Rinaldi went to the office and removed 8 boxes of material, some of which he eventually returned to the company. Rinaldi testified he took the boxes because of the "extreme uncertainty" of his position and to get documents to protect against termination.

38. Rinaldi returned to the office the next morning between 5 and 6 a.m. He found a note on the door and his key would not work.

### C. After-acquired evidence

39. On numerous occasions during his tenure with CCX, Rinaldi used accumulated frequent flyer miles for business travel but sought reimbursement from CCX for the actual cost of the flights. (Def. Trial Ex. 48). Rinaldi claims he discussed this practice with the company's auditors and CFO Feeney. Sedan also testified that she checked with CFO Feeney regarding this practice. Both Feeney and Sedan adopted a "no harm" attitude since the practice did not harm the company but Sedan found the practice "borderline." Rinaldi never reported this reimbursement as taxable income.

40. Rinaldi testified that he did not report the cash on his IRS returns because it fell under the responsibility of CFO Feeney. The Court finds his testimony not credible. The frequent flyer scheme is dishonest on its face.

41. Rinaldi also used company money to pay for lunches that sometimes included family

members and others not associated with the company. Rinaldi testified that he was trying to create a family friendly culture at the office. Rinaldi also sought reimbursement as a business expense for spousal travel, claiming it was company policy.

42. McGillicuddy testified that had he known of these practices, he would have fired Rinaldi. However, McGillicuddy testified on cross-examination that even if the CFO had known about the practice and failed to disclose it to the Directors, that he would not have fired the CFO since Rinaldi can be "intimidating." The Court finds the self-serving, uncorroborated testimony of McGillicuddy unconvincing.

43. There is no evidence that subsequent to learning of Rinaldi's frequent flyer scheme, lunch and spousal travel reimbursement that the full Board of Directors ever complied with the Bylaw provisions for removal of an officer by majority vote.

## CONCLUSIONS OF LAW

### A. Termination

Rinaldi's claim arises under ERISA § 502(a)(1)(B). In order to prevail, Rinaldi must prove by a preponderance of the evidence that he was entitled to his severance benefits under ERISA. "In interpreting ERISA plans, we turn to the principles of the federal common law of contracts." Denzler v. Questech, Inc., 80 F.3d 97, 101 (4th Cir. 1996). Federal courts may also "turn to principles of state common law for guidance." Id. The touchstone of interpreting a plan covered by ERISA is the written plan's express terms. As the Fourth Circuit Court of Appeals has observed, "'[t]he award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself.'" Hickey v. Digital Equip. Corp., 43 F.3d 941, 947 (4th Cir. 1997) (quoting Lockart v. United Mine Workers 1974 Pension Trust, 5 F.3d 74, 78 (4th Cir. 1993)). Thus, the Court must examine the Plan

11

to determine whether it is ambiguous on its face.

Federal courts "interpret the terms of [ERISA plans] in an ordinary and popular sense as would a [person] of average intelligence and experience." Hammond v. Fidelity & Guar. Life Ins. Co., 965 F.2d 428, 430 (7th Cir. 1992) (internal quotation marks omitted). It is a general principle of contract law that, where the language of an agreement clearly expresses the intent of the parties, courts may not rely on extrinsic evidence to vary its terms. See Neuma, Inc. v. AMP, Inc., 259 F.3d 864, 873 (7th Cir. 2001) (noting that the federal common law of contract interpretation applies to the interpretation of ERISA plans, the Seventh Circuit explained that "[i]n attempting to interpret such plans, our first task is to determine if the contract at issue is ambiguous or unambiguous. Contract language is ambiguous if it is susceptible to more than one reasonable interpretation. If a district court determines that the provision is without ambiguity, we have noticed that it need not consider extrinsic evidence and should proceed to declare the meaning of the provision. Thus, if a document governing an ERISA plan is unambiguous, this Court will not look beyond its four corners in interpreting its meaning." (internal quotation marks and citations omitted)). The Court finds that the language in the Employment Agreement is not ambiguous.

The circumstances under which Rinaldi is eligible to receive the severance package can be found in paragraph 10 of the Employment Agreement. It provides that if CCX terminated Rinaldi involuntarily, CCX had to pay Rinaldi "a lump sum . . . equal to two (2) times [his] then Minimum Annual Base Compensation" [which was $360,000 in 2004] and had to "provide . . . for a period of twenty-four (24) months after [his] termination date" the following additional benefits that Rinaldi had enjoyed as CCX's CEO: automobile allowance, term life insurance, travel, accident insurance, comprehensive and major medical coverage, 401(k) Savings and Investment Plan, long-term

disability insurance and "any other benefits normally available to executives of [CCX]." Thus, in order for Rinaldi to be eligible for his severance package, the evidence must show that he did not voluntarily resign as CEO and that he was not terminated for cause.

With regard to the conversation on October 6, 2004, Rinaldi, McGillicuddy, and Silverstein all have different interpretations of the words used at the conclusion of the phone call. Regardless of the actual words used, the Court finds that Rinaldi's statement did not constitute an offer of resignation. Under general rules of contract formation, an offer and acceptance can only form a contract when there is a mutual meeting of the minds between the parties. Cunningham v. Brown, 276 S.E.2d 718, 723 (N.C. Ct. App. 1981) ("[T]here can be no contract without a meeting o the minds."). There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations.

When an expression of resignation has been made, the expression must clearly show an intent to resign. "Oral declarations do not constitute a resignation where ambiguous and subsequent acts and declarations are entirely inconsistent with any intention to resign." Fletcher Cyclopedia of the Law of Corporations Ch. 11, § 346. Rinaldi's statement during the phone call was ambiguous and conditional, and he could not have intended his statement to operate immediately as a resignation. At most, Rinaldi's statement amounted to an ultimatum or a threat of future action, not an immediate resignation.

The meaning given to words or other conduct depends to a varying extent on the context and on the prior experience of the parties. In this case, Rinaldi's words were ambiguous, but his conduct was unambiguous after he learned of the meaning McGillicuddy and Silverstein attached to his words. Rinaldi clearly had no intent to resign when he told McGillicuddy and Silverstein that he was

13

out or that they were going their separate ways. He tried to reconnect with Silverstein and McGillicuddy, returned to his office, participated in a scheduled phone call with CFO Feeney, told Feeney that he did not resign, left a message with McGillicuddy's wife that he did not resign, repeatedly denied that he resigned when he reached McGillicuddy on the phone, sent a series of emails to correct any impression that McGillicuddy and Silverstein might have had regarding his statement, and returned to work on October 7, 2004, only to find that the locks had been changed. All of these actions show that Rinaldi's words were not intended as a resignation of his position as CEO of CCX.

Financial motivation, or lack thereof, also supports the court's conclusion. Rinaldi lost his severance benefits if he resigned. On the other hand, Silverstein saw Rinaldi as an obstacle to maximizing shareholder value upon liquidation in the days leading up to the phone call. Notwithstanding the shareholders testimony that Rinaldi was "critical" or "crucial" to the sales process, the evidence establishes the opposite – that Rinaldi had come to be seen as an obstacle to the desire to maximize shareholder value. McGillicuddy and Silverstein's actions of treating Rinaldi's statement as if he resigned and thereafter locking him out of the office, sending him a letter alleging resignation/acceptance, and telling him to go home because he was no longer authorized to run the business further indicate that Rinaldi was terminated without cause. The Court concludes that CCX terminated Rinaldi without cause, and thus Rinaldi is entitled to his severance benefits under his Employment Agreement.

### B.     After-acquired Evidence

To prevail on the after-acquired evidence defense, CCX must establish not only that Rinaldi engaged in the alleged misconduct, but that "the wrongdoing was of such severity that the employee

14

in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon v. Nashville Banner Publ. Co., 513 U.S. 352, 362-63 (1995). For those courts that have adopted the after-acquired evidence doctrine as a bar, CCX must show three things: (1) Rinaldi was guilty of some misconduct of which CCX was unaware; (2) the misconduct constitutes "acts of dishonesty" in connection with CCX's business, "gross neglect" of his obligations, or "illegal acts;" and (3) had CCX would have discharged Rinaldi for cause had it known of the misconduct. Teter v. Republic Parking Sys., 181 S.W.2d 330, 340 (Tenn. 2005).

CCX failed to establish by a preponderance that it did not know of Rinaldi's policy of cashing in frequent flier miles for cash reimbursements from the company. CFO Feeney's knowledge of Rinaldi's conduct constitutes knowledge to the corporation. Thus, CCX has failed the first prong of the test.

CCX also failed to establish by the preponderance that it would have discharged Rinaldi had it known of the behavior. First, there is insufficient evidence that CCX would have terminated its CEO if it had known of his scheme. The company's ByLaws provide the mechanism for such removal and the issue of officer wrongdoing was never presented to the Board consistent with the ByLaws. Second, McGillicuddy's testimony alone is insufficient to establish the third prong. The Court was not persuaded by the self-serving statements of McGillicuddy that had he known of the misconduct, he would have terminated Rinaldi for cause. During McGillicuddy's testimony, he stated that he was now aware that CFO Feeney had knowledge of Rinaldi's misconduct and failed to disclose it to the Shareholders. Nonetheless, CFO Feeney was kept in employment or a consulting capacity for CCX. If McGillicuddy was unwilling to terminate the CFO who condoned Rinaldi's conduct, it follows that McGillicuddy would not have fired the CEO if he knew of Rinaldi's scheme.

The Court concludes that CCX has not prevailed on the after-acquired evidence defense.

### C. Conclusion

The Court concludes that Rinaldi has shown by a preponderance that he was involuntarily terminated. CCX has failed to produce any evidence that it would have terminated Rinaldi if it had known of his reimbursement schemes and thus has failed to prove its defense of after-acquired evidence. Thus, Rinaldi is entitled to his severance benefits under his Employment Agreement.

## AMOUNT OF AWARD

### A. Rinaldi's Award

The parties have stipulated that Rinaldi's ERISA claim for salary and benefits amounts to $880,000.00. This is comprised of $720,000.00 in salary and $160,000.00 in equitable relief for the other benefits. Accordingly, plaintiff is entitled to $880,000.00.

### B. Pre-judgment Interest

"ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court." Quesinberry v. Life Ins. Co. of N. America, 987 F.2d 1017, 1030 (4th Cir. 1993). A district court may exercise its discretion to award pre-judgment interest in order to compensate the plaintiff "for the loss of the use of his funds." Id. at 1030-31. After deciding to award pre-judgment interest, the district court also has discretion to determine the appropriate rate. Id. at 1031.

Rinaldi is entitled to pre-judgment interest in this case. Because of CCX's unreasonable refusal to pay Rinaldi's severance benefits, Rinaldi was unable to obtain the value of the benefits he was entitled to, while CCX could continue to use the funds. Additionally, the award of pre-judgment interest will make Rinaldi whole.

The Court determines that pre-judgment interest should be calculated at the rate prescribed at 28 U.S.C. § 1961 for use with post-judgment interest. The parties are directed to submit their calculations of the amount of pre-judgment interest within thirty (30) days from the filing of this order.

### C. Attorney's Fees and Costs

ERISA provides that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. § 1132(g)(1). The Court is guided by a five-factor test in evaluating whether to exercise its discretion to award attorney's fees:

> (1) the degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

Metro. Life Ins. Co. v. Pettit, 164 F.3d 857, 865-66 (4th Cir. 1998).

The Court finds that with regard to the first factor, there is some evidence that CCX acted in bad faith justifying an award of attorney's fees to plaintiff. The Court finds that CCX has enough assets to easily satisfy an award of attorney's fees. The third and fourth factors do not weigh in favor of an award of attorney's fees. Since Rinaldi was asserting only his personal interest under the plan, there would be no deterrent effect and he was not seeking to benefit anyone other than himself under the Plan. Additionally, this case did not attempt to resolve a significant legal question regarding ERISA. Thus, the third and fourth factors weigh against an award of attorney's fees. Balancing the factors, the Court concludes that the relative merits of the parties' positions do not weigh in favor of a fee award. Thus, the Court will deny Rinaldi's request for attorney's fees and costs.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that judgment be entered for plaintiff in the amount of $880,000.00 plus pre-judgment interest to be determined by the Court at a later date.

**IT IS SO ORDERED**.

Signed: February 18, 2009

Robert J. Conrad, Jr.
Chief United States District Judge